UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| RICKY GENE PRYOR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:11CV2094 TIA |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3) for judicial review of the denial of Plaintiff's applications for Disability Insurance Benefits under Title II of the Social Security Act and for Supplemental Security Income benefits under Title XVI of the Act. The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

**I.  Procedural History**

On July 22, 2009, Plaintiff filed applications for Supplemental Security Income and Disability Insurance Benefits, alleging that he became unable to work on December 12, 2006 due to bipolar disorder, obsessive-compulsive disorder, depression, and panic/anxiety disorder. (Tr. 48, 102-14) The applications were denied on November 16, 2009, after which Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 45-53)  On June 21, 2011, Plaintiff testified at a hearing before the ALJ. (Tr. 25-44)  In a decision dated July 1, 2011, the ALJ found that Plaintiff had not been under a disability from December 12, 2006 through the date of the decision. (Tr. 10-20)  The Appeals Council denied Plaintiff's request for review on September 30, 2011. (Tr. 1-3)  Thus, the decision of the Appeals Council stands as the final decision of the Commissioner.

## II.  Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was represented by counsel, who first examined Plaintiff.  Plaintiff testified that he previously worked as a laborer for four years.  His job ended because he was unable to cope with his emotions and feelings, and he was getting in trouble with management.  Plaintiff stated that he was placed on a short-term disability plan and then terminated when the time expired.  Plaintiff's issues had worsened since then.  He testified that he was unable to work a full-time job because when he interacted with others, he became irritable, cranky, and unable to get along with others.  Plaintiff stated that he was diagnosed with bipolar disorder, which caused him to be terribly sad for days, then hyper and reckless.  On his worst days, Plaintiff stayed in bed and only left to use the bathroom or eat.  He averaged three or four bad days in a week.  An average bad day consisted of getting out of bed and sitting in a chair.  He was restless but could not focus on anything, even the TV.  He became irritable and snapped at people, so he sat in his chair most of the day until he took a nap or it was time for bed.  Plaintiff testified that he had difficulty being around groups of people, such as in a church setting.  Sometimes he was fine.  However, other times, he would feel anxious and need to leave within a few minutes.  He stated that changes in routine or his environment made him irritable and angry.  (Tr. 29-32)

Plaintiff further testified that he had gout, which crippled him when it flared up.  He experienced flare-ups five or six times a year, and they lasted from a week to ten days.  Plaintiff was unable to walk during these periods.  The gout usually affected his left foot, but his last attack affected both feet and his left knee.  Plaintiff also was diagnosed with GERD, which caused chest pains.  He experienced GERD on a daily basis, and he drank water and took antacids to relieve the symptoms.  Anxiety made the symptoms worse.  In addition, he received little benefit from his GERD

or his bipolar medications. Side effects from his prescriptions included weakness, tremors, dizziness, headaches, and dry mouth. (Tr. 32-34)

Plaintiff lived in a house with his mother. He took care of the yard once in awhile by mowing with a riding and a push mower. He could push the mower for 15 minutes before needing to rest for 15 minutes. He did not mow the lawn until absolutely necessary because he had trouble finding motivation to do simple things. Plaintiff testified that his mother took care of the household chores. He was able to cook meals in the microwave. He used the computer to email his children once or twice a day. He was able to drive and had no problems with driving. However, he occasionally forgot where he was and where he was going. Plaintiff received vocational training in electronics and computer for automotive repair. (Tr. 34-36)

During a typical day, Plaintiff woke up, watched TV, ate breakfast, lay in his room, ate lunch, watched TV, and went to bed. Plaintiff testified that he became winded with physical exertion. He had trouble walking briskly; however, he could walk at an average pace for a quarter mile. In addition, he could only stand for 10 to 15 minutes before needing to sit down due to painful feet. The ALJ also examined the Plaintiff, who stated that he did not take prescription medication for gout. He previously took Naproxen, but it made him sick.   (Tr. 36-38)

Charles R. Poor, a vocational expert ("VE"), also testified at the hearing. The VE stated that he had familiarized himself with the Plaintiff's vocational background. Plaintiff had three job titles that constituted past relevant work: automotive technician, which was medium and skilled; laborer at a recycling center, which was classified as medium and unskilled but was heavy and semiskilled as Plaintiff described the job; and truck driver, which was medium and skilled. The ALJ then asked the VE to assume an individual of the same age, education, and work experience as the Plaintiff. He had

no exertional limitations but could not be exposed to dangerous machinery or unprotected heights. He could not operate a motorized vehicle. In addition, the person was limited to simple, routine, repetitive tasks in environments involving only simple, work related decisions. He was also limited to only occasional interaction with supervisors, coworkers, and the public. Given this hypothetical, the VE testified that the individual could not do any of Plaintiff's past work. However, a significant number of jobs existed nationally and in Missouri which the individual could perform. Examples of such jobs included kitchen helper, laundry worker, and equipment cleaner. The VE opined that employers would tolerate one or two absences a month, but no more. Further, to maintain employment, the worker must attend to and concentrate on his job 80 percent of the work day or work week. Exceeding the limits on absences and breaks would preclude competitive employment.

In a Disability Report – Adult, Plaintiff stated that he was 6 feet tall and weighed 230 pounds. He reported becoming severely depressed after a manic episode which lasted a week or so. He stayed in bed and got up only to eat or go to the bathroom. With regard to working, Plaintiff could sit, lift, and carry things. However, he could not concentrate on basic instructions and orders, and he lost track of his duties. He got in trouble with management because he could not carry out instructions, and he had difficulty with coworkers because he was irritable. Depression caused fatigue, and Plaintiff stated he took 2-3 naps a day. Plaintiff stopped working because his symptoms became so pronounced, he could no longer function in his job. (Tr. 126-28)

Plaintiff also completed a Function Report – Adult. His daily activities included eating breakfast, going back to bed, eating lunch, going back to bed, eating supper, sitting around, and going to bed by 10:00 PM. Before his condition, Plaintiff could hold down an job and socialize. Plaintiff seldom got a full night of sleep. He bathed and groomed infrequently, and his mother had to remind

4

him to take care of his personal needs and take medication. He was able to make sandwiches, microwave meals, and canned soup daily. In addition, he could vacuum, do laundry, and mow the lawn. He went outside 2 to 3 times a week, and he shopped for groceries and clothes. He had no hobbies but was able to attend church once a week and exchange emails with his daughters. Plaintiff reported that his condition affected his ability to remember, complete tasks, concentrate, understand, follow instructions, and use his hands. In addition, he could not handle stress or changes in his routine. He stated that he suffered from 10 to 15 periods of decompensation a year. He became manic and engaged in risky behavior, followed by profound depression lasting 7 to 10 days. (Tr. 153-60)

Plaintiff's cousin also completed a Function Report Adult – Third Party. She did not know about Plaintiff's daily activities. He lived with his mother and assisted her with cooking, cleaning, and lawn care. He prepared meals daily and was able to shop for groceries and clothing in stores and online. He played the accordion and communicated via the computer. Plaintiff was content staying at home, but he used to be more social. When Plaintiff was stressed, he constantly moved and talked excessively. (Tr. 167-74)

### III. Medical Evidence

Plaintiff saw Dr. Julius F. Punzalan on January 10, 2007 for a 2-week check up. He reported feeling improved but had discontinued using Xanax and Buspar. Dr. Punzalan assessed anxiety/depression, increased Plaintiff's Buspar dosage, and referred him to a psychiatrist. (Tr. 217) Plaintiff returned to Dr. Punzalan on February 22, 2007 and reported that he was doing better. Dr. Punzalan noted that Plaintiff had seen a psychiatrist, who had changed his medication. Plaintiff appeared comfortable and was scheduled to return to work in one week. (Tr. 216)

5

On January 2, 2009, Plaintiff presented to F.G. Hicks, M.D., at ABC Allied Behavioral Consultants. Dr. Hicks noted that Plaintiff had been doing well and enjoyed the recent holidays. His concentration was fair, and he denied crying spells or irritability. He napped in the afternoon on occasion. His interaction with his mother was good, and he was attending to her health needs. Plaintiff believed he was unemployable due to problems maintaining a schedule. Dr. Hicks assessed Bipolar II Disorder Depressed; Likely Obsessive-Compulsive Disorder with Poor Insight; Alcohol Dependence Sustained Full Remission; and a GAF of 65. Dr. Hicks also noted that Plaintiff was overweight with possible gout, and he was applying for disability. Dr. Hicks prescribed Depakote and Abilify, and he encouraged Plaintiff to abstain from alcohol use. (Tr. 223)

On April 7, 2009, Dr. Hicks noted that Plaintiff was very manic, could not sleep, and had a disability hearing the following Monday. Dr. Hicks increased the Abilify dosage. Plaintiff saw Dr. Hicks on April 8, 2009 and reported feeling anxious and downcast regarding his disability hearing. Plaintiff also reported sleeping better with the additional Abilify, but he had limited motivation or exercise. He was concerned over his mother's medical condition but planned to resume his interest in four wheeling when the weather improved. Dr. Hicks assessed Bipolar II Disorder Depressed; Likely Obsessive-Compulsive Disorder with Poor Insight; Alcohol Dependence Sustained Full Remission; and a GAF of 65. He told Plaintiff to return in 3 months. (Tr. 222)

Plaintiff called Dr. Hicks on June 1, 2009 and indicated a desire to resume work without restrictions. Dr. Hicks prepared a letter noting that Plaintiff was prepared to return to work without restrictions. Plaintiff returned to Dr. Hicks on July 10, 2009. Plaintiff stated that he had decided to appeal his disability denial and was not rehired for that reason. He applied for food stamps and Medicaid and was greatly distressed with the judge's adverse ruling. Plaintiff had been active in

caring for his mother. Dr. Hicks noted that Plaintiff was serious and conversant, with good eye contact. He assessed Bipolar II Disorder Depressed; Likely Obsessive-Compulsive Disorder with Poor Insight; Alcohol Dependence Sustained Full Remission; and a GAF of 65. (Tr. 221)

In a letter dated August 19, 2009, Dr. Hicks stated that Plaintiff had been under his care since January 2007 and off work since May of that year. Dr. Hicks opined that Plaintiff remained unable to work due to low mood, anxiety, emotional liability, and obsessions. In addition, Plaintiff received limited benefit from medications and was disabled from work. (Tr. 224)

Plaintiff returned to Dr. Hicks on August 28, 2009. Plaintiff reported feeling motivated by his appeal process. He was sleeping well and had a good appetite. He stated he was getting enough exercise and had recently cut some downed trees. He continued his medication without incident other than mild weight gain and mild tremor. Dr. Hicks again diagnosed Bipolar II Disorder Depressed; Likely Obsessive-Compulsive Disorder with Poor Insight; Alcohol Dependence Sustained Full Remission; and a GAF of 65. (Tr. 254)

On October 23, 2009, Plaintiff reported that he had been in fair spirits, having received Medicaid benefits. He continued to pursue disability coverage. Plaintiff had not been drinking recently. He did not ride his four-wheeler because it was no fun riding alone. Although he continued to worry about finances and legal matters, he and his family noticed improvements with continued medications. Dr. Hicks provided the same diagnoses and advised Plaintiff to return in 2 months. (Tr. 253)

On November 11, 2009, Paul Stuve, Ph.D., a non-examining medical consultant, completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment. Dr. Stuve assessed Bipolar Disorder based on mood swings, depression, and manic episodes. He opined

that Plaintiff had mild restrictions to activities of daily living and moderate restrictions in maintaining social functioning and maintaining concentration, persistence, or pace. He had insufficient evidence to assess whether Plaintiff had repeated episodes of decompensation. In addition, Dr. Stuve found only moderate limitations in Plaintiff's ability to maintain attention and concentration for extended periods; in his ability to work in coordination with or proximity to others without being distracted by them; and in his ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Further, Plaintiff was moderately limited in his ability to interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. (Tr. 225-39)

Plaintiff returned to Dr. Hicks on December 18, 2009 and reported sleeping well and having a good appetite. He denied recent crying or irritability but reported decreased concentration. He had good interaction with his family but limited recreation due to his four-wheeler being stuck in second gear. He had been hauling wood with his truck. In addition, his attorney planned to have a vocational rehab therapist evaluate Plaintiff. Dr. Hicks assessed Bipolar II Disorder Depressed; Likely Obsessive-Compulsive Disorder with Poor Insight; Alcohol Dependence Sustained Full Remission; and a GAF of 65. He advised Plaintiff to return in 2 months. (Tr. 252)

Plaintiff saw Dr. Punzalan on February 5, 2010 for complaints of gastritis. Dr. Punzalan assessed rectal bleeding and GERD. He advised Plaintiff to return in 3 months. (Tr. 267) On May 5, 2010, again saw Dr. Punzalan for medication refills. (Tr. 266)

When Plaintiff returned to Dr. Hicks on May 28, 2010, he had lost 30 pounds and reported sleeping better. He was concerned over his mother's recent fall and leg fracture. Dr. Hicks gave the same diagnosis and advised Plaintiff to return in 2 months. (Tr. 251)  Plaintiff saw Dr. Punzalan on June 4, 2010 for complaints of a severe cough, loss of appetite, and generalized weakness. Dr. Punzalan assessed bronchitis. (Tr. 265)

Plaintiff called Dr. Hicks on June 30, 2010 requesting medication for sleep. He called again on July 12, 2010 and reported not sleeping for 4 days because he was full of thoughts during the night. On July 15, 2010, he stated the new medication was not working, but he was feeling better with Geodon. (Tr. 250)  Plaintiff returned to Dr. Punzalan on August 4, 2010 for a check up and medication refill. Dr. Punzalan diagnosed GERD. (Tr. 264)

On August 13, 2010, Plaintiff told Dr. Hicks that he had been in fair spirits and that he contacted a law firm regarding his disability applications. He experienced more social anxiety in crowds, including in church. He had been sleeping well with fair appetite. His recreation and exercise were limited, with fair concentration. He was looking forward to visiting with his children on Labor Day. (Tr. 250)

Plaintiff returned to Dr. Hicks on October 8, 2010. He reported occasional restless sleep with good appetite and interest. He was doing things around the house, and he was happy that his four-wheeler was fixed. Plaintiff had fair concentration and no recent health problems. (Tr. 249) Plaintiff saw Dr. Punzalan on November 4, 2010. Dr. Punzalan removed a skin tag and assessed GERD. (Tr. 263)

On December 3, 2010, Plaintiff told Dr. Hicks he was struggling with "troubling dreams" but denied hallucinations, paranoia, or irritability. He stated he cried occasionally at church. His energy

9

was fair, and he continued taking his medication without incident. He thought his disability hearing would be in early 2011, and he reiterated his aversions to crowds. (Tr. 248)

Plaintiff called Dr. Hicks' office on December 13, 2010 and stated he was very depressed and not sleeping. Dr. Hicks prescribed Mirtazepine. (Tr. 247) On January 17, 2011, Plaintiff complained of left foot and left ankle edema with pain during an office visit with Dr. Punzalan. Dr. Punzalan assessed gout with left big toe and ankle pain and prescribed Naprosyn. (Tr. 262) Plaintiff returned to Dr. Punzalan on February 4, 2011, complaining of pain in his other foot radiating to his knee, which resolved through eating cherries. He discontinued using Naprosyn because it caused upset stomach. Dr. Punzalan noted that Plaintiff was doing fine and needed medication refills. (Tr. 261)

Plaintiff had an appointment with Dr. Hicks on February 11, 2011and was in good spirits. He had been sleeping well and had been active with his four-wheeler. Plaintiff was distressed over problems with Medicaid coverage, but he was pleased that his mother was stable. He mentioned transient symptoms of gout. (Tr. 247)

On April 8, 2011, Plaintiff was in fair spirits but told Dr. Hicks that he did not think he would reach a point where he was not a little down. He was worried and keyed up about his recent disability hearings. He worked in his yard for exercise. (Tr. 246)

Dr. Hicks completed a Medical Source Statement – Mental on May 17, 2011. He opined that Plaintiff was moderately limited in his ability to remember locations and work-like procedures; understand and remember very short and simple instructions; carry out detailed instructions; and maintain attention and concentration for extended periods. In addition, Dr. Hicks opined that Plaintiff was moderately limited in all aspects of social interaction. Plaintiff had marked limitations in his

ability to understand and remember detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work related decisions; and complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  He possessed marked limitations in all areas of his ability to adapt.  (Tr. 257-58)

On June 8, 2011, Dr. Punzalan completed a Medical Source Statement – Physical.  He opined that Plaintiff could lift and carry 20 pounds frequently and 50 pounds occasionally.  Plaintiff could stand and/or walk for 15 minutes continuously and 1 hour throughout an 8 hour day.  Further, he could sit continuously for 1 hour and could sit for 2 hours throughout an 8 hour day.  Dr. Punzalan also opined that Plaintiff could never climb or crawl, and he could only occasionally balance, stoop, kneel, and crouch.  Plaintiff should avoid exposure to extreme heat, wetness/humidity, dust/fumes, and heights.  In addition, Dr. Punzalan stated that Plaintiff experienced pain all day, which caused a decrease in Plaintiff's concentration, persistence, or pace.  (Tr. 271-72)

## IV.  The ALJ's Determination

In a decision dated July 1, 2011, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2013.  He had not engaged in substantial gainful employment since December 12, 2006, his alleged onset date.  The ALJ further found that Plaintiff had the severe impairments of bipolar disorder and anxiety disorder but that he did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 12-15)

After carefully considering the record, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with several nonexertional limitations.  Plaintiff was limited to occupations that did not require exposure to dangerous machinery, exposure to unprotected heights, or driving motorized vehicles.  He was also limited to simple, routine, repetitive tasks, not performed in a fast-paced production environment, and only involving simple, work-related decisions and relatively few work place changes.  Finally, Plaintiff could have only occasional interaction with supervisors, co-workers, and the general public.  In reaching this determination, the ALJ gave great weight to the consulting physician's opinion because it was supported by the medical record as a whole.  However, the ALJ gave minimal weight to Dr. Hicks' opinion because it was inconsistent with the medical record and with his own treatment notes.  Likewise, Dr. Punzalan's opinion received minimal weight, as the ALJ found it inconsistent with the medical record and treatment records.  The ALJ stated that the RFC finding was supported by Plaintiff's treatment history, objective clinical findings, Plaintiff's subjective complaints, the observations and comments from treating doctors, the opinion of the State agency medical consultant, and all the evidence of record considered as a whole.  (Tr. 16-18)

In addition, the ALJ found that Plaintiff was unable to perform any of his past relevant work. Based on his closely approaching advanced age, at least high school education, work experience, and RFC, the ALJ determined that jobs existed in significant numbers in the national economy which Plaintiff could perform.  These jobs, as set forth by the VE, included kitchen helper, laundry worker, and equipment cleaner.  Therefore, the ALJ concluded that Plaintiff had not been under a disability at any time from December 12, 2006 through the date of the decision.  (Tr. 18-19)

## V.  Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability.  42 U.S.C. § 423(a)(1).  The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months."  20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process.  See 20 C.F.R. § 404.1520(b)-(f).  Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that he has a severe impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities; or (3) he has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) he is unable to return to his past relevant work; and (5) his impairments prevent him from doing any other work.  Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence.  42 U.S.C. § 405(g).  "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'"  Cruse v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)).  The Court does not re-weigh the evidence or review the record de novo.  Id. at 1328 (citing Robert v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)).  Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence.  Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[1] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d

---

[1]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak, 49 F.3d at 1354.

## VI.  Discussion

Plaintiff raises two arguments in his Brief in Support of the Complaint. First, he argues that the ALJ failed to properly consider the treating physician opinion in compliance with social security regulation ("SSR") 96-2p because the ALJ failed to cite specific evidence before discounting the opinion. Second, Plaintiff asserts that the ALJ's RFC finding is not in accord with SSR 96-8p because the ALJ relied too heavily on the non-examining, consulting physician's opinion. Defendant, on the other hand, contends that the ALJ properly evaluated Plaintiff's credibility and subjective complaints and properly weighed the medical opinions from acceptable medical sources. The undersigned finds that substantial evidence supports the ALJ's determination such that the decision of the Commissioner denying benefits should be affirmed.

### A.  Weight Given to the Treating Physician

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight . . . provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted); see also SSR 96-2P, 1996 WL 374188 (July 2, 1996) ("Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques."). Further, "[i]t is appropriate to give little weight to statements of opinion by a treating physician that consist of nothing more than vague, conclusory statements." Swarnes v. Astrue, Civ.

15

No. 08-5025-KES, 2009 WL 454930, at *11 (D.S.D. Feb. 23, 2009) (citation omitted).

As noted by the ALJ, Dr. Hicks' medical source statement showing marked limitations was inconsistent with the medical evidence as a whole and with Dr. Hicks' own treatment records. For instance, Dr. Hicks consistently gave Plaintiff GAF scores of 65, showing only mild symptoms.[2] (Tr. 17) Further, the ALJ correctly noted that treatment records reflected Plaintiff's ability to care for his mother, haul wood, ride his four-wheeler, and perform activities of daily living. (Tr. 17) Medical records from Dr. Hicks also showed that Plaintiff was in good spirits, slept well, had a good appetite, and had good interaction with his family. (Tr. 17, 223, 247-54) Dr. Hicks' treatment notes and subsequent opinion was based on Plaintiff's subjective complaints, not objective findings, supporting the ALJ's decision to give Dr. Hicks' opinion non-controlling weight. Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (citation omitted). In addition, medication was successful in controlling his symptoms. "An impairment which can be controlled by treatment or medication is not considered disabling." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (citation omitted); see also Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009) ("There is substantial evidence that, when taken as directed, the medication [plaintiff] was prescribed was successful in controlling his mental illness."). In short, substantial evidence supports the ALJ's decision to discount the opinion of Dr. Hicks, as the medical source statement was inconsistent with Dr. Hicks' notes and was based on Plaintiff's subjective complaints and not objective findings. Teague v. Astrue, 638 F.3d 611, 616 (8th Cir. 2011); see also Partee v. Astrue, 638 F.3d 860, 864 (8th Cir. 2011) ("Because [the treating

---

[2] A GAF score of 61 to 70 indicates "some mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000).

spychologist's] determination contradicted other objective evidence in the record, the ALJ's decision to give less weight to [the] determination was reasonable.").

### B. Weight Given to the Non-Examining, Consulting Physician

Next, Plaintiff argues that the ALJ erred in relying too heavily on the non-examining, non-treating physician, Dr. Stuve, to determine Plaintiff's RFC. RFC is a medical question, and an ALJ's finding must be supported by some medical evidence. Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir.2004). However, the ALJ still "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir.2000) (citation omitted).

Contrary to Plaintiff's assertion, the Court finds that the ALJ properly explained why Dr. Stuve's opinion was superior to Dr. Hicks' opinion and properly accorded greater weight to Dr. Stuve in making the RFC determination. "When evaluating a non-examining source's opinion, the the ALJ 'evaluate[s] the degree to which these opinions consider all of the pertinent evidence in [the] claim, including opinions of treating and other examining sources.'" Wildman v. Astrue, 596 F.3d 959, 967 (quoting 20 C.F.R. § 404.1527(d)(3)). The weight given to an opinion from a non-examining source "will depend on the degree to which they provide supporting explanations for their opinions." 20 C.F.R. §§ 404.1527(b)(3), 416.927(b)(3). "The better an explanation a source provides for an opinion, the more weight we will give that opinion." Id.

Here, Dr. Stuve provided a thorough explanation for the opinions rendered in the Psychiatric Review Technique and Mental RFC Assessment and cited to multiple sources of evidence in support. The evidence included treatment notes from Dr. Hicks and Plaintiff's own subjective allegations and complaints. (Tr. 235, 239) In addition, the ALJ did not give Dr. Stuve's opinion controlling weight,

17

but merely accorded greater weight based upon the fact that the opinion was consistent with and supported by the medical record as a whole. (Tr. 17) The record shows that the ALJ considered Dr. Stuve's opinion in addition to the treatment records and objective medical evidence from Dr. Hicks and the medical record as a whole. (Tr. 18) Thus, the ALJ did not rely solely on the non-examining consultant's opinions but properly considered all of the medical evidence to formulate Plaintiff's RFC. See Gray v. Astrue, No. 4:11CV72 FRB, 2012 WL 830477, at *14-15 (E.D. Mo. March 12, 2012) (finding the ALJ did not err in considering the opinion of the non-examining medical consultant where the ALJ considered all of the evidence in the record and accepted the opinion as consistent with such evidence). The medical evidence demonstrates that Plaintiff is able to perform the requirements of work with those non-exertional limitations set forth in the opinion and supported by Dr. Hicks' treatment notes and Dr. Stuve's opinion. As a result, the undersigned finds that substantial evidence supports the ALJ's RFC determination and the conclusion that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**. A separate Judgment in accordance with this Memorandum and Order is entered this same date.

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this 13th day of February, 2013.